Filed 3/26/13  P. v. Ramirez CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B232114 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. GA075509) |
| v. | |
| DARIO DANIEL RAMIREZ and TOMAS CARRILLO RAMIREZ, | |
| Defendants and Appellants. | |

APPEALS from judgments of the Superior Court of Los Angeles County. Candace J. Beason, Judge.  Affirmed.

Earl C. Broady, Jr., for Defendant and Appellant Dario Daniel Ramirez.

Gail Harper, under appointment by the Court of Appeal, for Defendant and Appellant Tomas Carrillo Ramirez.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Susan Sullivan Pithey, Supervising Deputy Attorney General, Louis W. Karlin, Deputy Attorney General, for Plaintiff and Respondent.

_____

Defendants Dario Daniel Ramirez and Tomas Carrillo Ramirez appeal from the judgment entered following a jury trial in which they were convicted of second degree murder, attempted voluntary manslaughter, and mayhem. They challenge the sufficiency of evidence and contend that the prosecutor engaged in prejudicial misconduct. Tomas also contends the court's instruction on the natural and probable consequences doctrine permitted him to be convicted on the basis of negligence and that the trial court erred by admitting statements he made after he invoked his right to silence during custodial interrogation. We affirm.

## BACKGROUND

A little before 2:30 a.m. on December 28, 2008, Rodolfo Macias was fatally shot four times from behind, with three of the shots entering the back of his head and one entering his upper back. (Undesignated date references are to 2008.) Raymond Salcedo was also shot in the face and lost his left eye, but survived. He had no memory of what happened to him. Macias and Salcedo were shot at the conclusion of a confrontation with members of the Pasadena Latin Kings gang.

Salcedo lived with Edwin Galvez on Mar Vista in Pasadena. On the evening of December 27, Galvez held a backyard barbecue attended by Salcedo, Macias, and Adrian Nava, who lived down the street. None of the four were gang members, but Salcedo and Macias had shaved heads and may have looked like gang members. Nava arrived around midnight. He testified he had been at the home of a different friend earlier that evening and had already consumed about eight beers over the course of about six hours. Upon arrival at Galvez's house, he collected money and went to purchase two 12-packs of beer, which he took back to Galvez's house. Then the four men sat around drinking and talking in the backyard. Nava estimated that over the course of the entire night—at Galvez's home and at the home of the other friend—he consumed 11 to 17 beers. Galvez testified he drank four or five beers before Nava arrived and two more after Nava bought beer.

2

At some point, Macias borrowed Nava's mobile phone and walked out to the street with Salcedo. Ten or twenty minutes later, Nava was concerned about getting his phone back, so he and Galvez walked out to the sidewalk at the end of Galvez's driveway. They saw Macias and Salcedo on the sidewalk three to five houses away. As Galvez and Nava stood waiting for Macias and Salcedo to return, they saw a dark blue Jeep Liberty drive very slowly toward them. It stopped in front of Galvez's driveway. At trial, Galvez and Nava identified Tomas as the driver of the Jeep and Dario as its front seat passenger. A younger, thinner, clean-shaven man was in the back seat, and both Galvez and Nava had previously identified photographs of Jose Arnaud, who was convicted in a prior trial, as depicting the back seat passenger.

Tomas and Dario asked Galvez and Nava where they were from, which Galvez and Nava understood as an inquiry regarding gang affiliation. Both Galvez and Nava replied, "Nowhere." Nava testified that he then added that he had "'nothing to do with you guys. You guys could leave now. You already did what you have to do.'" Galvez testified that Nava said, "Just let it be." Tomas became agitated and said, "'You think I'm going to leave this like that?'" Tomas and Dario got out of the Jeep and approached Galvez and Nava. Galvez testified that Tomas and Dario said, "Pasadena Latin Kings," and "'PLK,'" and again asked where Galvez and Nava were from. Nava testified that Tomas again asked, "'Do you think I'm going to leave that like that?'" Nava replied, "'Do whatever you want. I'm not going to do nothing. If anything, you're going to punch me, I'll punch you back.'" Galvez and Nava both testified that they had been "'hit-up'" by gang members (asked where they were from) on numerous prior occasions and no violence had ensued.

Salcedo and Macias then began walking or running toward Tomas, Dario, Galvez, and Nava. Dario and Tomas turned away from Galvez and Nava and walked up to Salcedo and Macias and asked them where they were from. Salcedo responded by shrugging his shoulders and shaking his head. Galvez testified that Tomas and Dario stood on either side of Macias and grabbed and held his shoulders. Arnaud then got out

3

of the Jeep, walked behind Salcedo, pointed a gun at the back of Salcedo's head, and fired. Salcedo fell to the ground. Tomas and Dario held onto Macias, who struggled to get away from them. Galvez began to run back to his home and heard, but did not see Macias get shot. Nava testified that "the driver" pushed Salcedo, then shot him "point blank in the eye." After Salcedo fell, "the passenger" grabbed Macias's sweater and began shoving him in the chest while holding onto him. Nava did not remember seeing Macias get shot. According to Nava, the back seat passenger never got out of the Jeep. Nava ran back to Galvez's house. Nava testified he saw the men get back into the Jeep and Galvez testified he saw the Jeep drive away with three men inside. Macias was mortally wounded.

Pasadena police Detective Keith Gomez began surveillance of Tomas's home on the morning of December 28. About 11:00 a.m., Tomas walked to a blue Jeep Liberty parked on the street. He sat in the front passenger seat and reached into the rear seat, where he grabbed a dark plaid Pendleton-type shirt. He then stood between the car and the open passenger-side door and picked items up off the floor. He put some of the items in his trouser pockets, closed the door, and walked back to the house carrying two beer cans and the shirt. About 11:15 a.m., Tomas again emerged from the house. After looking up and down the street, he walked around to the side of the porch. Dario came outside and handed Tomas a clear plastic bag containing dark clothing. Tomas took the bag and threw it next to some garbage. The police detained Tomas and Dario and searched the house. They found no guns, ammunition, or drugs. They recovered the clear plastic bag, inside of which was a Pendleton-type shirt that appeared to be the same one Gomez saw Tomas remove from the Jeep.

Galvez identified the Pendleton-type shirt recovered from the trash outside Tomas's house as the one Arnaud wore during the shooting. Nava also identified this shirt, but was unsure whether the front seat passenger (Dario) or the driver (Tomas) wore it. Nava testified that Arnaud was wearing a hooded sweatshirt. Arnaud's girlfriend, Frances Kono, identified the shirt as belonging to Arnaud, but she told the police that she

4

thought Dario or Tomas borrowed the shirt on the night of the shootings. She knew at the time she spoke to the police that the shirt was important to the case. The shirt had a bloodstain on it that contained a mixture of two contributors' DNA. The major contributor matched Macias's profile, and Arnaud was a possible minor contributor. Tomas and Salcedo were excluded as the minor contributor, but Dario could neither be included nor excluded. A swab from the shirt's collar had a mixture of three contributors. Arnaud and Macias were possible contributors, Tomas and Salcedo were excluded as the minor contributor, but Dario could neither be included nor excluded.

Kono testified that she loved Arnaud, who was the father of her child. He was a Pasadena Latin Kings gang member known as "Little One." On the night of December 27, she and Arnaud went to a party with Arnaud's sisters and "Cricket," who was also a member of the Pasadena Latin Kings gang. They left when the party broke up. Cricket's hand was bleeding and everyone in their car was "pumped up." Dario phoned Arnaud during the party and while they were driving home from the party. After they got home from the party, Tomas and Dario came to the house. Tomas, Dario, and Arnaud sat in the living room and discussed what had happened at the party. They became "rowdy." Tomas showed everyone a gun. Kono wanted Tomas and Dario to leave, and she left the living room. Arnaud told them to leave, but Kono heard them talking in the living room for at least an hour. She heard Dario repeatedly say, "Let's go put in work" or "You need to go put in work." She understood "put in work" to mean "go get their enemies." Kono was angry, and around midnight she went out with a friend for about an hour. The next morning, Kono saw Arnaud with a gun that looked like the one Tomas had displayed the night before. She asked Arnaud about it, and he replied, "Stupid Little G." Little G. was Dario's moniker. Kono later saw the gun inside an air conditioner. The police did not find the gun when they searched the home, and Kono later gave it to one of Arnaud's friends.

Kono also made a statement to the police in February of 2009, a recording of which was played at trial. She told the police she was at the party on the night of

5

December 27 and was aware that someone had been stabbed there. When her group got back to Arnaud's house, Dario and Raton (Tomas) came over. Before they arrived, they had phoned Arnaud repeatedly. Tomas brought a gun to the house and showed it to everyone. Both Kono and Arnaud repeatedly told Tomas and Dario to leave, but they stayed. Kono was angry, so she went into the room of one of Arnaud's sisters and ultimately fell asleep. Before she fell asleep, she heard Dario saying, "'Let's go put in some work,'" "'Come on. Let's go. Let's go do this,'" and "'You need to like, put in some work.'" The next morning Kono saw Arnaud with a gun that looked like the one Tomas had displayed the night before. She asked Arnaud why he brought a gun to their house. He replied, "'Stupid Little G.'"

Arnaud's sister Mary Lopez testified that she was at the party with Arnaud, her sister, Cricket, and Kono. A man said disrespectful things to Arnaud and Arnaud challenged him to fight. A "rumble" ensued, and Mary and Arnaud were involved in it. They left the party after the rumble. Tomas and Dario came to their house after they got home. Arnaud asked the women to leave the living room. Kono argued with Arnaud, then said she was going to go out with a friend. While Kono was in the bathroom getting ready to go, Tomas came into Mary's bedroom and showed Mary and her sister Carolina a gun. Carolina began shouting angrily. Dario entered the room, expressed anger at Tomas, and took him back to the living room. Mary saw Arnaud leave the house about one hour after Tomas and Dario arrived. She fell asleep, but awakened later to the sound of car doors closing. She saw Arnaud, Tomas, and Dario come back into the house. The three men sat in the living room, drank, and played video games.

The prosecution's gang expert, Officer Andrea Perez, testified that most of the Latino gangs in Pasadena do not have fixed territories, but in December of 2008, Galvez's home was in an area claimed by the Villa Boys gang, which was a "mortal enem[y]" of the Pasadena Latin Kings gang. Perez opined that Tomas, Dario, and Arnaud were members of the Pasadena Latin Kings gang. Tomas and Arnaud were admitted members, and each had numerous Latin Kings gang tattoos. Arnaud had an

6

"LK" gang tattoo on the back of his head. At the time of the charged offenses, Arnaud shaved his head. Tomas's moniker was Raton. Dario also had several Latin Kings gang tattoos. At the time of the charged offenses, he was acting as a "shot caller," that is, a leader who gives orders to other gang members, in the Pasadena Latin Kings gang in the absence of his older brother Jorge, who was a shot caller. Failure to follow a shot-caller's order would subject a member of the gang to discipline, usually a physical assault.

Perez testified that gang members "put in work" by committing crimes for the gang, and they do so to prove their allegiance to their gang and earn respect within the gang. In response to the prosecutor's detailed hypothetical question based on the prosecution's evidence at trial, Perez opined that the shootings described in the question would be an example of putting in work and would have been committed for the benefit of, and in association with, the Pasadena Latin Kings gang. The gang would benefit because the shootings would show the neighborhood that the Pasadena Latin Kings gang is a violent force to be reckoned with, that it would not tolerate disrespect, and that it would violently punish those who failed to give it respect. The offenses would intimidate the community and diminish the likelihood anyone would disrespect them again. The offenses would also enhance the reputation within the gang of each member who participated in the offenses.

Perez also testified that when gang members ask where someone is from they are challenging potential rivals. This is called a "hit-up" and, in Perez's opinion, is a form of putting in work. Typically, nothing would happen if the person queried says "from nowhere" and is not disrespectful. A disrespectful or sarcastic response, such as telling the gang member to leave, could be seen as a challenge to the gang member. If other gang members witness a disrespectful or sarcastic response, there is a "great probability" that violence will result. If a gang member makes such a challenge in the territory of a rival gang, it will typically result in a physical assault, but could even result in murder. A gang member making such a challenge is expected to be able to back it up. The

7

probability of a violent response increases with the presence of a loaded gun.  Perez also testified that within the gang community, "creeping" means hunting for "prey" while walking or driving slowly and methodically.

Tomas and Dario each made several statements to the police.  The police interviewed Dario three times on December 28.  The first time, he claimed he was no longer active in the gang and denied both knowledge of the shootings and being in a blue Jeep.  In the second interview, Dario admitted being in the blue Jeep and said he heard about a fatal shooting, but he had been dropped off at home before the shooting.  In the third interview, Dario admitted he was at the scene of the shooting, but initially claimed he did not see it occur because he was drunk and lying in the back seat.  Then he admitted he saw Arnaud shoot two men, but claimed he stayed inside the Jeep the entire time.  Dario said there was a confrontation with two men who said, "We don't bang," but then began "talking shit."  Dario saw the two men approach and saw Arnaud turn around and walk toward them.  Dario saw Arnaud shoot the first victim, who fell to the ground.  Dario then admitted getting out of the Jeep "when they started shooting."  Finally, Dario admitted that he got out of the Jeep when "the two guys were walking up."  He said that after the first victim fell to the ground, he ran back to the Jeep and heard two more gunshots.  They dropped Arnaud off at his house and Arnaud took the gun with him.  Dario also told the police that before the shootings he had been at the home of a friend named Toro, then he went to Arnaud's house, where there had been a discussion with Arnaud about Arnaud's being in a fight and getting thrown out of a club that evening.  A redacted recording of Dario's third interview was played at trial.

The police interviewed Tomas late at night on December 28, then again around midnight, and a third time about 5:00 p.m. on December 29.  In the first interview, Tomas admitted driving his mother's blue Jeep Liberty on the night of December 27, but denied being at the scene of the shootings.  He said he had gone to his friend Toro's house and returned home at 10:30 or 11:00 p.m.  Tomas said he had not been active in the gang for four or five years, and although he knew Arnaud, he did not socialize with him.  During

8

the second interview, the detective played about seven minutes of a recorded interview with Arnaud. Tomas became visibly upset, but did not make any admissions. Tomas was readvised of his rights pursuant to *Miranda v. Arizona* (1966) 384 U.S. 436, 444 [86 S.Ct. 1602] (*Miranda*), before the third interview. In the third interview, Tomas said he "messed up" and should not have "talked shit to these guys," meaning the two men he originally hit up. He said he heard a gunshot, then got back in the Jeep and drove to Arnaud's house. He was upset with Arnaud and asked him, "'What did you do?'" Later, Tomas admitted that he was the one who decided to stop the Jeep on Mar Vista and "talk shit" to the two men by asking them where they were from. He got out of the Jeep first. Tomas then noticed the two other men walking or running toward him. He walked up to them. None of the four men on the street were armed. Later still, Tomas said he stopped the Jeep because Arnaud said, "'Stop, stop, stop.'"

Tomas also told the police that while he was at Toro's house, he heard about Arnaud's involvement in a fight at a party. Tomas went looking for Arnaud, but he was not home. Later, Tomas went back to Arnaud's house when Arnaud was home with his sisters, Kono, and Cricket. Tomas knew that there was a gun in the Jeep at the time they left Arnaud's house with Arnaud. Tomas had handled the gun and removed the bullets from it earlier that night at Toro's house. Tomas claimed that Arnaud wanted to borrow the Jeep, but Tomas refused and offered to drive Arnaud where he wanted to go.

Dario called Detective Ara Bzdigian as a witness. Bzdigian testified that Nava was unable to identify Dario in photographic arrays, and he said that Tomas was the front seat passenger. Officers searched Dario's home, but found no guns, ammunition, or gang photographs. Bzdigian further testified that the crime scene was between Arnaud's house and Dario's house, but it was not a direct route.

Tomas called Dr. Roberto Lacarra as a defense gang expert. Lacarra testified that a "hit-up" is the method by which gang members say hello, although it can also be a challenge. Gang members "go around all day long hitting up each other," but it is rare for violence to result. Lacarra opined that a flippant response by a non-gang member

would not lead to violence because the person responding was not a rival gang member, and thus not a threat. But he also testified that a disrespectful response or remark "would lead to a fight probably," but homicide was a possibility. Lacarra testified that "putting in work" took different forms for different gang members, depending upon their talents, and did not necessarily entail acts of violence. It could mean painting graffiti, obtaining drugs, or just hitting-up people. Lacarra agreed that driving up the street at about 10 miles per hour would be considered "creeping," but if the gang members were looking for rivals, they would likely drive a stolen car with the headlights off. Retaliation is a "big factor in gang violence." If a gang fails to retaliate, it shows weakness, which will cause the gang to fall victim to further violence.

Lacarra opined that Tomas was an inactive gang member who did not know Arnaud well. Tomas had only a driver's license violation on his record. Because neither Tomas nor Dario had served time in prison, Lacarra opined that it was unlikely that they were shot callers in the gang. Lacarra admitted that a shot caller could be someone who had committed violent crimes in the presence of other gang members but had not been caught by law enforcement.

Tomas was originally tried with Arnaud using separate juries. Arnaud was convicted of first degree murder, attempted murder, and mayhem, with gang and firearm-use findings, but Tomas's jury could not reach a verdict. During the second trial, Tomas and Dario were tried together with a single jury. The jury convicted Tomas and Dario of second degree murder, attempted voluntary manslaughter, and mayhem. The jury further found that each offense was committed for the benefit of, at the direction of, or in association with a criminal street gang, with the specific intent to promote, further, or assist in criminal conduct by gang members; and a principal fired a gun, causing death or great bodily injury in the commission of each offense (Pen. Code, § 12022.53, subds. (b), (d), (e); undesignated statutory references are to the Penal Code). The court sentenced each defendant to prison for 69 years to life, consisting of 15 years to life for murder and

10

4 years for mayhem, with each of these sentences enhanced by 25 years to life pursuant to section 12022.53, subdivisions (d) and (e).

## DISCUSSION

**1.     Instruction upon natural and probable consequences doctrine**

One who knows another's unlawful purpose and intentionally aids, promotes, encourages, or instigates the crime is guilty as an aider and abettor of both the offense he or she intended to facilitate or encourage (the target crime) and any other crime committed by the person he or she aids and abets that is the natural and probable consequence of the target crime. (*People v. Prettyman* (1996) 14 Cal.4th 248, 259, 261 (*Prettyman*).) An aider and abettor need not have intended to encourage or facilitate the particular offense ultimately committed, and need not have had the specific intent otherwise required for the offense committed. (*Id.* at p. 261.) "Liability under the natural and probable consequences doctrine 'is measured by whether a reasonable person in the defendant's position would have or should have known that the charged offense was a reasonably foreseeable consequence of the act aided and abetted.' [Citation.]" (*People v. Medina* (2009) 46 Cal.4th 913, 920 (*Medina*).) "A reasonably foreseeable consequence is to be evaluated under all the factual circumstances of the individual case [citation] and is a factual issue to be resolved by the jury. [Citations.]" (*Ibid.*) The jury need not unanimously agree on the specific target crime that the defendant aided and abetted, but "each juror must be convinced, beyond a reasonable doubt, that the defendant aided and abetted the commission of a *criminal act*, and that the offense actually committed was a natural and probable consequence of that act." (*Prettyman*, at p. 268.) To assist the jury in properly applying the doctrine, the trial court's instructions to the jury must identify and describe the specific target crime or crimes that the defendant allegedly aided and abetted. (*Id.* at pp. 266–267.)

Over defendants' objection, the trial court instructed the jury on the natural and probable consequences doctrine using CALCRIM No. 403, which, as given, provided as follows: "Before you may decide whether the defendant is guilty of the crimes charged,

11

you must decide whether (he/) is guilty of assault, battery and/or assault with a deadly weapon. [¶] To prove that the defendant is guilty of the crimes charged, the People must prove that: [¶] 1. The defendant is guilty of assault, battery and/or assault with a deadly weapon, [¶] 2. During the commission of assault, battery and or ADW a coparticipant in that assault committed the crime of murder, attempted murder and mayhem, [¶] AND [¶] 3. Under all of the circumstances, a reasonable person in the defendant's position would have known that the commission of the murder, attempted murder & mayhem was a natural and probable consequence of the commission of the assault, battery or adw. [¶] A coparticipant in a crime is the perpetrator or anyone who aided and abetted the perpetrator. It does not include a victim or innocent bystander. [¶] A natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes. In deciding whether a consequence is natural and probable, consider all of the circumstances established by the evidence. If the charged crimes were committed for a reason independent of the common plan to commit the assault, battery &/or ADW, then the commission of the crimes charged was not a natural and probable consequence of assault, battery and or adw. [¶] To decide whether crime of assault, battery and or adw was committed, please refer to the separate instructions that I (will give/) you on (that/) [*sic*] crimes. [¶] The People are alleging that the defendant originally intended to aid and abet assault, battery and/or adw. [¶] If you decide that the defendant aided and abetted one of these crimes and that the crimes charged were a natural and probable consequence of that crime, the defendant is guilty of the crimes charged. You do not need to agree about which of these crimes the defendant aided and abetted." When reading this instruction, the court informed the jury that "ADW" was an abbreviation for assault with a deadly weapon. The court also read the second numbered element as follows: "[N]umber 2, during the commission of assault, battery, and/or assault with a deadly weapon, a coparticipant in the assault, battery, and/or assault with a deadly weapon committed the crime of murder, attempted murder, and mayhem."

While admitting that his contention "has been decided against him by the

12

California Supreme Court in *People v. Croy* (1985) 41 Cal.3d 1, 12, fn. 5," Tomas contends that the natural and probable consequence instruction given here "dispensed with the usual intent requirement for convictions" of second degree murder, attempted voluntary manslaughter, and mayhem, and instead permitted him to be convicted based upon "simple negligence," that is, "a 'should have known as a reasonable person' standard." Tomas explains that he raises the issue to preserve a claim under *Apprendi v. New Jersey* (2000) 530 U.S. 466 [120 S.Ct. 2348] (*Apprendi*) for review in the California Supreme Court.

CALCRIM No. 403 correctly set forth the natural and probable consequences doctrine and met the requirements of *Prettyman*. Numerous decisions have upheld both the application of the natural and probable consequences doctrine and the formulation set forth in the standard jury instructions. (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 184–185 [application of natural and probable consequences doctrine does not permit conviction based upon vicarious negligence theory of liability]; *People v. Richardson* (2008) 43 Cal.4th 959, 1021–1022 [application of natural and probable consequences doctrine does not unconstitutionally predicate murder liability on mere negligence]; *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 107 [natural and probable consequences doctrine does not excuse proof of required mental state and CALJIC No. 3.02 correctly instructs the jury on the natural and probable consequences doctrine]; *Prettyman*, *supra*, 14 Cal.4th at pp. 271–272 [CALJIC No. 3.02 properly stated natural and probable consequences doctrine and did not withdraw element from jury's determination or fail to instruct jury it must find particular intent to convict].)

*Apprendi*, *supra*, 530 U.S. 466, essentially requires any fact, other than a prior conviction, "that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." (*Id.* at p. 490.) Instruction upon the natural and probable consequences doctrine with CALCRIM No. 403 did not result in the failure to submit to the jury any fact necessary to Tomas's conviction of second degree murder, attempted voluntary manslaughter, and

13

mayhem or a failure to prove any such fact beyond a reasonable doubt.

For all of these reasons, we reject Tomas's contention.

**2.      Sufficiency of evidence**

Tomas and Dario contend that the evidence was insufficient to support their convictions. Dario argues that Kono was not believable and the evidence did not establish who actually shot the victims. Both Tomas and Dario argue there was no evidence that they intended to aid and abet any of the target offenses or that any target offense was committed. They also argue that the evidence was insufficient to show that the offenses of which they were convicted were natural and probable consequences of stopping and asking someone's gang affiliation. Finally, Dario argues the evidence was insufficient to support the gang enhancement finding because Perez's "opinion was based on a hypothetical which included Dario implausibly making the 'put in work' remark," and her opinion "cannot supply the specific intent element of the crime."

To resolve this issue, we review the whole record in the light most favorable to the judgment to decide whether substantial evidence supports the conviction, so that a reasonable jury could find guilt beyond a reasonable doubt. (*People v. Ceja* (1993) 4 Cal.4th 1134, 1138.) We presume the existence of every fact supporting the judgment that the jury could reasonably deduce from the evidence and make all reasonable inferences that support the judgment. (*People v. Barnes* (1986) 42 Cal.3d 284, 303; *People v. Catlin* (2001) 26 Cal.4th 81, 139.)

"An appellate court must accept logical inferences that the jury might have drawn from the circumstantial evidence." (*People v. Maury* (2003) 30 Cal.4th 342, 396.) Only the jury may determine the credibility of a witness and the facts upon which such credibility depends. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.) We may not substitute our own view of a witness's credibility. (*Ibid.*) Weaknesses and inconsistencies in eyewitness testimony are for the jury to evaluate. (*People v. Allen* (1985) 165 Cal.App.3d 616, 623.) Testimony believed by the trier of fact is rejected on appeal only if it is physically impossible that the testimony is true or its falsity is apparent

without resorting to inferences or deductions.  (*Ibid*.)  Even testimony that is subject to justifiable suspicion does not justify the reversal of a judgment.  (*Ibid.*)  The jury is entitled to reject portions of a witness's testimony and accept other portions.  (*Ibid.*)

Kono's credibility was a matter for the jury to determine.  The matters to which she testified were not physically impossible and her testimony was not obviously false without resort to inferences or deductions.

Although Nava testified that "the driver" shot the victims, the testimony of Galvez and the statements of both defendants showed that Arnaud shot them.  Throughout the trial, the prosecutor and both defense attorneys treated Arnaud's identity as the shooter as an established fact and presented the case to the jury on the premise that Arnaud shot both victims.  Nava's differing testimony in no way undermines the sufficiency of the evidence to support either defendant's convictions.

Viewing the evidence and all reasonable inferences from the evidence in the light most favorable to the verdicts, we conclude substantial evidence supported the verdicts, with or without resort to the natural and probable consequences doctrine, and defendants' other contentions have no merit.

At the party on the evening of December 27, a man disrespected Arnaud, who had a large Pasadena Latin Kings gang tattoo on the back of his shaved head.  Arnaud and his sister Mary Lopez fought with the man in a "rumble," and the jury could infer that Cricket, another Pasadena Latin Kings gang member, participated in the rumble also, at which time his hand was injured.  Tomas admitted that he heard about Arnaud's fight at the party while Tomas was at his friend Toro's house.  Dario also admitted being at Toro's house, and later arrived at Arnaud's house with Tomas.  Kono testified Dario phoned Arnaud while Arnaud's group was still at the party and while they were driving back to Arnaud's house.  Tomas admitted going to Arnaud's house twice to look for him, finding him home on the second try.  According to Kono's testimony, and partially corroborated by Dario's statement, Arnaud discussed the incident at the party with Tomas and Dario at Arnaud's house.  The men got "rowdy" during this discussion, and after

15

that, Dario told Arnaud that he needed to go with them to "put in work." The jury could infer from all of this evidence and the testimony of both gang experts that Tomas and Dario believed that the incident at the party involving Arnaud and Cricket harmed the reputation of the Pasadena Latin Kings gang and required that Arnaud "put in work," perhaps in the form of retaliation, to repair the damage to the gang's reputation.

According to Kono's testimony and statement to the police, Arnaud asked Tomas and Dario to leave, but they stayed and Dario pressured Arnaud to go with them and "put in work," saying, "Come on. Let's go. Let's go do this," and "You need to like, put in some work." According to Perez, Dario was acting as a shot caller, and another gang member could not refuse an order by a shot caller without subjecting himself to discipline. According to Kono, Tomas displayed a gun at Arnaud's house in Dario's presence. According to Lopez, Dario became quite angry at Tomas for showing Lopez and her sister the gun. Tomas admitted that while he was at Toro's house, he handled the gun that was later used in the charged crimes. The jury could thus infer that Tomas brought the gun to Arnaud's house and provided it to Arnaud when they left to "put in work" or before they got out of the Jeep at the crime scene. The jury could further infer from the shootings that occurred that the gun was loaded. Furnishing Arnaud with a gun supported a strong and reasonable inference that both Tomas and Dario intended that Arnaud would use the gun—even if just by pointing it at someone—while obeying Dario's order to go with them and "put in work." This supported, at a minimum, a finding that Tomas and Dario intended to aid and abet an assault with a deadly weapon (one of the target offenses upon which the trial court instructed), which can be committed by pointing a loaded gun at a person. The jury could also have concluded that a reasonable person in the defendants' position would have or should have known that murder, attempted murder, and mayhem are reasonably foreseeable consequences of an assault with a deadly weapon, especially a loaded gun. In addition to Tomas's assistance through providing the loaded gun to Arnaud and Dario's instigation of the crimes by ordering Arnaud to "put in work," Tomas aided Arnaud by driving him in the blue Jeep

16

very slowly through the territory of the Pasadena Latin Kings gang's mortal enemy to find potential targets. Dario aided Arnaud by providing additional manpower.

Tomas admittedly stopped when he saw Nava and Galvez standing on the sidewalk and got out of the Jeep in order to "talk shit" to Nava and Galvez. According to both Galvez and Nava, Dario got out of the Jeep right after Tomas did. When Macias and Salcedo approached, Tomas and Dario both confronted them and, according to Galvez, Dario and Tomas stood on either side of Macias and grabbed and held him by his shoulders. Doing so constituted a battery, another of the target offenses upon which the trial court instructed. As Dario and Tomas grabbed and held Macias, Arnaud got out of the Jeep, walked up behind Salcedo, and shot Salcedo in the back of the head. Dario and Tomas continued to restrain Macias as he struggled to break free, then Arnaud shot Macias three times in the back of his head and once in his upper back. From the coordinated efforts of Arnaud's getting out of the Jeep as or after Tomas and Dario placed themselves on each side of Macias and restrained him by his shoulders, thus leaving Macias's head and torso as a target, the jury could reasonably infer defendants' knowledge and intent to aid and abet a murder or an assault with a deadly weapon as the result of a preexisting plan between the Tomas, Dario, and Arnaud. The jury could also conclude that a reasonable person in the defendants' position who participated in a plan to murder or commit an assault with a deadly weapon upon one person would have or should have known that committing an attempted voluntary manslaughter or mayhem upon a second person who was a companion of the first victim and would witness the shooting of the first victim was a reasonably foreseeable consequence.

Thus, the record provides substantial evidence that defendants intended to aid and abet a murder and an assault with a deadly weapon; Dario both instigated and assisted in the commission of a murder and an assault with a deadly weapon; Tomas assisted in the commission of a murder and an assault with a deadly weapon; Tomas and Dario personally committed a battery and aided and abetted a murder and assault with a deadly weapon; and second degree murder, attempted voluntary manslaughter, and mayhem

17

were natural and probable consequences of the target offenses of murder and assault with a deadly weapon.

Dario's contention regarding the sufficiency of evidence supporting the gang enhancement also has no merit. The "'put in work' remark" was supported by the record and was thus properly included in the hypothetical question the prosecutor posed to Perez. Notably, Dario did not object to the hypothetical question on that or any other basis. In support of his claim that Perez's opinion "cannot supply the specific intent element of the crime," Dario cites *In re Frank S.* (2006) 141 Cal.App.4th 1192 and *People v. Killebrew* (2002) 103 Cal.App.4th 644, 657–658. The portion of *Killebrew* Dario cites held that a gang expert improperly testified to the subjective knowledge and intent of each of 10 men in three cars. *Frank S.* cited *Killebrew* in support of its holding that a gang expert improperly testified to the subjective knowledge and intent of a minor who possessed a knife while alone. (141 Cal.App.4th at pp. 1197–1199.) We have read Perez's testimony and see no violation of the principle set forth in the cases Dario cited. In this regard, we note that the California Supreme Court has repeatedly held that a gang expert may testify in response to a proper hypothetical question that closely tracks the evidence in the case without rendering a prohibited opinion regarding a defendant's subjective mental state. (*People v. Vang* (2011) 52 Cal.4th 1038, 1051; *People v. Ward* (2005) 36 Cal.4th 186, 209–210; *People v. Gonzalez* (2006) 38 Cal.4th 932, 946 & fn. 3.)

In addition, Perez's testimony was not the sole evidence supporting the jury's finding that the crimes were committed with the specific intent to promote, further, or assist in any criminal conduct by gang members. The testimony of Kono, Galvez, and Nava, together with photographs of the gang tattoos of Dario, Tomas, and Arnaud supported a finding that Dario, Tomas, and Arnaud were all members of the Pasadena Latin Kings gang. Dario repeatedly told Arnaud he had to "put in work," which both the prosecution and the defense gang experts testified meant to commit crimes or "hit-ups" for the gang. After Tomas provided Arnaud with a gun, he and Dario accompanied Arnaud to "put in work." They drove slowly through enemy gang territory, and when the

18

group spotted two young men standing on the sidewalk, both Dario and Tomas got out to challenge them. In the course of doing so, Dario and Tomas proclaimed their own affiliation with the Pasadena Latin Kings. Dario and Tomas then grabbed and restrained Macias while Arnaud got out of the Jeep and shot Salcedo and Macias. And, as previously noted, the jury could infer that the prior incident involving Arnaud and Cricket at a party created the need for Arnaud to put in work. Thus, substantial evidence supported a finding that Dario intended to promote, further, or assist in criminal conduct by Arnaud when he directed Arnaud to put in work, accompanied Arnaud, proclaimed the name of their gang at the start of the confrontation that ultimately resulted in the crimes, and then restrained one of the victims so Arnaud could shoot him.

### 3. Prosecutorial misconduct

Tomas and Dario contend the prosecutor committed prejudicial misconduct violating the federal Constitution. Tomas argues, "The prosecution having failed to obtain a conviction at the first trial, [the prosecutor] engaged in misconduct at the second trial, changing her theory of liability over defense objection from aiding and abetting— which did not convince the first jury—to the factually insupportable natural and probable consequences theory in a deliberate ploy to reduce her burden of proof. (See *ante*, Discussion, pts. 1 & 2.) In doing so, the prosecutor presented false testimony." Tomas cites the testimony of Kono, Galvez, and Nava as purportedly false. Tomas and Dario contend the prosecutor committed misconduct by asking Perez improper and prejudicial questions that suggested they might have committed other, uncharged crimes.

"A prosecutor's conduct violates a defendant's federal constitutional rights when it comprises a pattern of conduct so egregious that it infects '"the trial with unfairness as to make the resulting conviction a denial of due process." [Citation.]' [Citation.] . . . Conduct that does not render a trial fundamentally unfair is error under state law only when it involves ""the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.'" [Citations.]'" (*People v. Bennett* (2009) 45 Cal.4th 577, 594–595 (*Bennett*).)

19

To preserve a claim of prosecutorial misconduct for appeal, the defendant must make a timely objection at trial on the ground asserted on appeal and request an admonition; otherwise, the point is reviewable only if an admonition would not have cured the harm or objection would have been futile. (*People v. Thomas* (2012) 54 Cal.4th 908, 937; *Bennett*, *supra*, 45 Cal.4th at p. 595.)

Although Tomas opposed instruction upon the natural and probable consequences theory, he never objected that allowing the jury to consider that theory constituted prosecutorial misconduct. Accordingly, he did not preserve this issue for appellate review. Even if he had, we would reject the contention, which is premised upon three fallacies: that the natural and probable consequences doctrine is a distinct theory of liability different from aiding and abetting, that the natural and probable consequences doctrine reduced the prosecutor's burden of proof, and that the natural and probable consequences doctrine was "factually insupportable." As addressed in the first two sections of this opinion, the natural and probable consequences doctrine is an aspect of aider and abettor liability and does not reduce the prosecutor's burden to merely proving negligence; although reliance upon the doctrine was not strictly necessary in this case, the theory was factually supported.

Tomas also forfeited his claim that the prosecutor presented false testimony by failing to raise it in the trial court. Even if he had preserved it for appellate review, we would not find merit in the claim. The record establishes neither that the testimony of Kono, Galvez, or Nava at the second trial was false nor that the prosecutor knew any of their testimony was false. (*People v. Harrison* (2005) 35 Cal.4th 208, 242.) The second trial was conducted more than two years after the charged crimes. Witnesses' memories had naturally faded in that interval, and, as they testified, Nava and Galvez were drinking in the hours preceding the commission of those crimes. Their testimony was nonetheless largely consistent with their testimony at the first trial. Tomas points in particular to Galvez's testimony at the second trial about Tomas and Dario "'holding' Macias as Arnaud 'executed' him," but the reporter's transcript from Tomas's first trial reflects that

20

Galvez testified that the driver and passenger (Tomas and Dario) were holding Macias by his arms or shoulders, with one on each side, when Arnaud shot Macias. As all parties recognized and the jury learned through cross-examination, Kono was evasive and claimed a failure of memory at the trial of Arnaud and Tomas, but was more forthcoming at the trial of Tomas and Dario. Tomas points, in particular, to her "wildly inconsistent testimony" that she "miraculously 'remembered'" that Tomas was in the room with Arnaud and that she overheard a conversation about putting in work. In the recorded statement Kono made to the police in February of 2009—which was admitted at both trials, Kono stated that Tomas and Dario were in the living room with Arnaud and she overheard Dario telling Arnaud he had to put in work. Kono testified for the first time at Tomas and Dario's trial that she left with a friend, but she explained that she had forgotten that detail until Lopez reminded her. No aspect of any witness's testimony—or anything in the record—demonstrated that the prosecutor knowingly presented any false testimony.

Tomas and Dario also contend that the prosecutor committed misconduct by asking Perez questions that suggested they might have committed other, uncharged crimes. On cross-examination, counsel for Dario asked Perez whether she would be surprised if Dario had no convictions for violent crimes. Perez replied, "No." On cross-examination by counsel for Tomas, Perez testified that she had reviewed Tomas's "rap sheet," and his only a conviction was for driving without a license.

On redirect examination, Perez testified, without objection, that not all gang members have convictions, and that a conviction stems from either a trial or a guilty plea. The prosecutor then asked whether it was possible for gang members to "commit crimes and just never get caught." The trial court sustained the defense objection that the question was argumentative. The prosecutor asked why Perez was not surprised that Dario did not have a conviction for a crime of violence. The court overruled an unspecified objection. Perez replied that the lack of a conviction did not mean the absence of an arrest for such a crime. The court sustained the defense objection that the

21

response constituted speculation and instructed the jury to disregard the answer. The prosecutor attempted to reframe the same question, and the court reaffirmed its prior ruling. The prosecutor began to ask, "And again, a conviction just means that somebody hasn't—it doesn't—" The trial court sustained defense counsels' objection that the question had been asked and answered. Finally, the prosecutor asked, "Are arrests always made after a crime has occurred?" The court overruled defense counsels' objection, and Perez responded, "No."

Tomas and Dario subsequently moved for a mistrial on the ground that the jury would have understood the prosecutor's questions to suggest that defendants had committed violent crimes for which they had not been convicted. They argued that although the court had sustained their objections, the purportedly improper suggestions inherent in the questions "came across loud and clear." The court denied the motion, finding that its evidentiary rulings, admonitions, and instructions were sufficient to prevent the jury from considering improper matters. The court added that it would be willing to give an additional curative jury instruction, if requested, but neither Tomas nor Dario requested one.

The trial court sustained the defense objections to the questions in issue and directed the jury not to consider the one answer Perez gave before the court sustained an objection. "When a trial court sustains defense objections and admonishes the jury to disregard the comments, we assume the jury followed the admonition and that prejudice was therefore avoided." (*Bennett*, *supra*, 45 Cal.4th at p. 595.) In addition, the court repeatedly instructed the jury that nothing the attorneys said was evidence, the attorneys' questions were not evidence, jurors should not "assume that something is true just because one of the attorneys asked a question that suggested it was true," jurors "must ignore any question" to which the court sustained an objection, if the witness was not permitted to answer a question jurors must "not guess what the answer might have been," and if the court ordered testimony stricken from the record, jurors "must disregard it and must not consider that testimony for any purpose." We presume that the jury followed

these instructions. (*People v. Williams* (2010) 49 Cal.4th 405, 469.) Accordingly, even if the prosecutor's questions were improper, the court's corrective actions eliminated the possibility of any unfairness.

**4. Admission of Tomas's statements**

Tomas sought to exclude his statements to the police on the theory that he had invoked his right to silence during his first interview. Although the appellate record does not include a transcript of the interview, the court read the pertinent portion into the record. Tomas said, "You read me—you read me my rights, man. I'm not gonna say nothing no more 'cause that's what I—what I told you. Don't—I'm not trying to—I don't want you to try to tell me things that I haven't done. You know what I'm saying?" The detective then asked, "Did you go to the trash?" Tomas asked, "What?" The detective asked, "Do you remember going to the trash can?" Tomas answered, "Like I told you, that's what I did when I was at my house. I went inside my house and I went to sleep. That's it, man."

The trial court concluded Tomas did not clearly and unequivocally invoke his right to silence. Tomas contends the court erred by admitting his statement. He also seems to argue that he never waived his rights to silence and counsel. We do not address the latter point because Tomas did not preserve it for appeal by raising it in the trial court and Tomas did not provide us with an adequate record to demonstrate the existence of such an error.

Before interrogating a person in custody, the police must warn the person that he or she has a right to remain silent, that any statement the person makes may be used as evidence, and that the person has a right to the presence of retained or appointed counsel. (*Miranda*, *supra*, 384 U.S. at p. 444.) A defendant may knowingly and intelligently waive these rights following advisement and an opportunity to exercise them. (*Id.* at p. 479.)

*Miranda* requires that the police immediately terminate an interrogation if a defendant who has waived his rights thereafter indicates during questioning that he wishes to remain silent or to speak with an attorney. (*Miranda*, *supra*, 384 U.S. at pp.

473–474.) But a defendant "may indicate an unwillingness to discuss certain subjects without manifesting a desire to terminate 'an interrogation already in progress.'" (*People v. Silva* (1988) 45 Cal.3d 604, 629–630 ["'I really don't want to talk about that'" not an invocation of right to silence].) Whether a suspect has actually invoked his or her right to silence or counsel is an objective inquiry: invocation requires that the suspect unambiguously articulate his desire to remain silent or have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be an invocation of the right to silence or counsel. (*Berghuis v. Thompkins* (2010) 560 U.S. __, __ [130 S.Ct. 2250, 2260]; *Davis v. United States* (1994) 512 U.S. 452, 459 [114 S.Ct. 2350]; *People v. Nelson* (2012) 53 Cal.4th 367, 379–380.) "A defendant has not unambiguously and unequivocally invoked his right to remain silent when his statements are merely expressions of passing frustration or animosity toward the interrogating officer or amount only to a refusal to discuss a particular subject." (*People v. Thomas* (2012) 211 Cal.App.4th 987, 1005 (*Thomas*); *id.* at p. 1006 ["'I ain't talking no more and we can leave it at that'" merely an expression of frustration with detectives' failure to accept protestations of innocence, not an unambiguous invocation of right to remain silent].) "It is not enough for a reasonable police officer to understand that the suspect *might* be invoking his right. [Citation.] Faced with an ambiguous or equivocal statement, law enforcement officers are not required under *Miranda* [citation] either to ask clarifying questions or to cease questioning altogether." (*People v. Stitely* (2005) 35 Cal.4th 514, 535.)

We independently review a trial court's ruling on a motion to suppress a statement under *Miranda*. (*People v. Waidla* (2000) 22 Cal.4th 690, 730.) But in doing so, "we accept the trial court's resolution of disputed facts and inferences, and its evaluations of credibility, if supported by substantial evidence." (*People v. Cunningham* (2001) 25 Cal.4th 926, 992.)

Tomas's statement to the police ("You read me—you read me my rights, man. I'm not gonna say nothing no more 'cause that's what I—what I told you. Don't—I'm

24

not trying to—I don't want you to try to tell me things that I haven't done.  You know what I'm saying?") was not an unambiguous and unequivocal invocation of his right to silence.  As in *Thomas*, *supra*, 211 Cal.App.4th at pages 1005–1006, Tomas appeared to be expressing frustration that the detective did not believe him and was accusing him of "things that I haven't done."  Similarly, in *In re Joe R.* (1980) 27 Cal.3d 496, the California Supreme Court concluded that the juvenile court reasonably determined that a minor did not invoke his right to silence when he said, "'That's all I have to say,'" but was instead saying, "That's my story, and I'll stick with it."  (*Id.* at p. 516.)  Accordingly, we conclude the trial court correctly ruled that Tomas did not invoke his right to silence, and his statements were properly admitted.

## DISPOSITION

The judgments are affirmed.

NOT TO BE PUBLISHED.


                                                    MALLANO, P. J.

We concur:


        ROTHSCHILD, J.


        CHANEY, J.

25